# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

|  |  |  |
|---|---|---|
| **DANIEL LEWIS LEE,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **Case No. 19-3399** |
| **T. J WATSON** | ) | **CAPITAL CASE** |
| | ) | **EXECUTION SCHEDULED FOR** |
| | ) | **DECEMBER 9, 2019** |
| Respondents. | ) | |

---

## PETITIONER-APPELLEE'S RESPONSE TO GOVERNMENT'S MOTION TO VACATE

---

MORRIS H. MOON
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

# INTRODUCTION

The Government told the jurors deciding Daniel Lee's capital sentence in the Eastern District of Arkansas that he had committed a prior murder. Although his cousin alone was convicted of that murder, the Government said the then teenage Lee was "legally and morally" responsible as well. The only reason he was not convicted, said the Government, was because the local Oklahoma prosecutors at the time gave him the "gift" of a plea to robbery. This was the "drastic distinction" between him and the more culpable codefendant:[1] Mr. Lee would present a future danger. He "got a do over" as a youth, the Government told the jurors, a second chance that he blew. Don't let this happen again. They did not.

Mr. Lee's sentence of death was imposed in 1999. For nearly twenty years the Government insisted it had met its obligations under

---

[1] The Arkansas prosecutors were compelled by Main Justice to proceed with a penalty phase hearing for Mr. Lee despite their attempt to drop death after the far more culpable Chevie Kehoe was sentenced to life imprisonment. At the time, the U.S. Attorney polled the lawyers, the case agents and the victims, and all agreed with a sentence of life without parole for Mr. Lee. Doc. 824 (Tr. May 10, 1999), Doc 827 (Tr. June 29, 1999). Despite the ultimate verdict, all of these people continue to believe that Mr. Lee should receive a life sentence.

*Brady v. Maryland.* Yet the above story was recently shown to be untrue. There was no gift: the Oklahoma judge at the time determined that the state prosecutors could not meet even the probable cause standard for a homicide and recommended they recharge on robbery instead. Daniel Lee was not legally or factually guilty of a murder, but of stealing the victim's keys.

By the time this evidence came to light, Daniel Lee's § 2255 proceedings had already concluded. He therefore filed on September 10, 2018 in the District Court for the Eastern District of Arkansas a second § 2255 alleging violations of *Brady v. Maryland* and *Napue v. Illinois* for the prosecution's failures to disclose the exculpatory facts and for its repeated misrepresentations to the jury. When, despite the suppression of the evidence, the district court deemed the claim successive under § 2255(h) and the Court of Appeals denied a certificate of appealability, Mr. Lee filed a petition pursuant to 28 U.S.C. § 2241 in the District Court for the Southern District of Indiana, the district encompassing USP Terre Haute where he is incarcerated. Because on July 25, 2019, the Government scheduled an execution date for Mr. Lee, he sought a

stay from the district court as well so that he could pursue his *Brady* and *Napue* claims.

Yesterday, the District Court of the Southern District of Indiana, the Hon. James Hanlon presiding, granted that stay, finding that Mr. Lee satisfied the requirements of this Court and the Supreme Court for a stay or preliminary injunction pending further proceedings. *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (petitioner must show likelihood of success on the merits, irreparable harm, a balance of the equities in his favor, and that they stay is in the public interest). This morning the Government moved this Court to lift the stay so that they might proceed with Mr. Lee's execution at once.

A district court's decision to stay an execution is reviewed for abuse of discretion. *See, e.g., Roberts v. Norris*, 415 F.3d 816, 819 (8th Cir.2005) (citing *Bowersox v. Williams,* 517 U.S. 345, 346 (1996)). A district court abuses its discretion "when it commits an error of law or makes a clearly erroneous finding of fact." *Evans v. Griffin*, 932 F.3d 1043, 1045 (7th Cir. 2019) (internal quotation marks and citation omitted).

The District Court's reasoned and well supported opinion granting Daniel Lee a stay of execution should not be disturbed by this Court.

## PROCEEDINGS BELOW

The history of Mr. Lee's continued attempts to gain access to exculpatory information in the Government's possession, and subsequently to bring into court the previously undisclosed evidence undermining the key basis for his sentence of death are aptly set out in the opinion of the District Court. Dkt. 3 at 2-6.

## ARGUMENT

I.    **Mr. Lee has Demonstrated a Likelihood of Success on the Merits of his *Brady* and *Napue* claims.**

The Government claims that Judge Hanlon misapplied the standard showing Mr. Lee's likelihood of success on the merits. Dkt. 3 at 13. Although Appellant cherry picks quotes from the opinion and tries to parse "probability" and "possibility", there can be little doubt that Judge Hanlon understood and applied the correct standard. The district court cited *Hill v. McDonough*, 547 U.S. 573 584 (2006) (stay requires "showing of a significant possibility of success on the merits")

4

and this Court's opinion in *Garza v. Lappin*, 253 F.3d 918, 920-21 (7th Cir. 2007).  In fact, Judge Hanlon concluded the opinion stating "Mr Lee has also demonstrated a significant possibility that he may be able to prevail on those claims by showing that United States suppressed evidence and misled the jury during his penalty phase." *Lee v. Warden*, 2019 WL 6609724 at *11.

The Government's reliance on *Dunn v. McNabb*, 138 S.Ct. 369 (2017) is also misplaced. In *McNabb*, the Supreme Court did not vacate an injunction for failure "to make the requisite finding of probable cause." Dkt. 3 at 14. The lower court in that case had already found no substantial likelihood of success on the merits but granted a stay on the All Writs Act as an alternative ground. *Grayson v. Dunn*, 2017 WL 4638594 at *4 (M.D. Al. Oct. 16, 2017). The Supreme Court rejected that approach because it permitted a stay with no finding of likely success. *Dunn*, 138 S.Ct. at 369. Because Judge Hanlon made detailed findings that Mr. Lee was likely to succeed on the merits, *Dunn* is inapposite.

> A. The Government violated its obligations under *Brady v. Maryland* when it failed to disclose that Mr. Lee was not in fact guilty of a prior murder.

5

The Government takes the absurd position that a prisoner can never satisfy the significant-probability-of-success standard where additional fact development is necessary. Dkt. at 13-14. Tellingly, it cites no authority for this proposition. That is because it is wrong. As the district court correctly noted, because the focus of the standard is on the *likelihood* of success, "Mr. Lee's obligation is not to *conclusively prove-up* these claims. It is to show a significant possibility that he can do so." *Lee*, 2019 WL 6608724 at *7 (emphasis added).

The Government's position is all the more remarkable given the nature of the claims here: it has sole possession of the facts needed to prove the claims. It cannot be heard to complain that Mr. Lee's claim should fail for lack of proof while it simultaneously continues to block Mr. Lee's efforts to obtain that proof.

This is not merely speculative. In the proceedings below, Mr. Lee proffered FBI records obtained through a Freedom of Information Act Request that demonstrate that the Government has not been candid—even now—about the extent of its contact with local Oklahoma authorities and its investigation into the Wavra matter prior to Mr.

6

Lee's trial. *See Lee*, 2019 WL 6608724 at \*8 (citing to district court docket entries). Indeed, when confronted with these FOIA records, the Government "*[did] not dispute* Mr. Lee's contention that none of the information or records gained from this investigation was disclosed to Mr. Lee." *Id.* (emphasis added).

Contrary to Government's characterization, Judge Hanlon did not find only a "mere possibility" of success on Mr. Lee's *Brady* and *Napue*; he found a *significant* possibility. *See id.* at 7 ("There is thus a *significant possibility* Mr. Lee can establish the materiality and favorability elements of his *Brady* claim.") (emphasis added); *id.* ("Mr. Lee has also established a *significant possibility* that two of the *Napue* elements are met.") (emphasis added); *id.* at 8 ("The evidence presented by Mr. Lee, particularly when viewed in context of what the United States admittedly does not know, is sufficient to demonstrate a *significant possibility* that Mr. Lee may be able to show that the United States had exculpatory information regarding Mr. Lee's robbery plea, and that it knew or should have known the arguments and statements made at the penalty phase regarding the circumstances surrounding Mr. Lee's plea in the Wavra case were misleading.") (emphasis added).

7

Indeed, as Judge Hanlon observed, the "District Court of conviction previously found that the *Brady* evidence was material (and thus favorable)." *Id.* at 7.

These findings were amply supported by the documents proffered by Mr. Lee, as well as the Government's failure to contest Mr. Lee's allegations. *See Lee*, 2019 WL 6608724 at *8. Under these circumstances, the Government cannot seriously contend that the district court's finding were clearly erroneous.

The Government continues to push a straw-man argument that both the district of conviction and Judge Hanlon saw through and rejected: that the fee application is the Brady evidence. It is not. The fee application "is only evidence of a Brady violation." *Lee*, at *8. Mr. Lee alleges that the Government, as part of its contacts with local Oklahoma authorities and its own investigation into the Wavra matter, must have learned of facts exculpatory to Mr. Lee and failed to disclose them—it is this information, the facts surrounding the plea, that constitutes the *Brady* material. *Id.*

Moreover, the Government's strawman argument is irrelevant to the *Napue* claim. Even assuming that claim was about the fee

8

application and therefore potentially was available to trial counsel, that would not have absolved the Government of its duty to correct false testimony and misleading impressions. And certainly the prosecution was not allowed to bolster such false and misleading evidence during arguments to the jury as it did in Mr. Lee's case. See *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("But the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false."); *United States v. O'Keefe*, 128 F.3d 885, 894-95 (5th Cir. 1997) ("[E]ven when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument … or the defense is unable to utilize the information … or when the government thereafter asks misleading questions.") (Internal citations omitted).

Additionally, the Government is engaged in burden-shifting. The *Brady* rule is aimed at defining an important prosecutorial duty, not the obligations of defense counsel. The Government's attempt to turn that duty on its head is not doctrinally supported and undermines the

9

purpose of *Brady*. In fact, the Supreme Court has explicitly rejected the notion that defense counsel's failure to discover exculpatory information relieves the prosecution of its constitutional duty of disclosure. See *Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."). See also *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 291 (3d Cir. 2016) ("[T]he concept of 'due diligence' plays no role in the *Brady* analysis."); *Amado v. Gonzalez*, 758 F.3d 1119, 1136-37 (9th Cir. 2014) (finding that the due diligence rule "is contrary to federal law as clearly established by the Supreme Court ... and unsound public policy."); *United States v. Tavera*, 719 F.3d 705, 711 (6th Cir. 2013) ("This 'due diligence' defense places the burden of discovering exculpatory information on the defendant and releases the prosecutor from the duty of disclosure. It relieves the government of its *Brady* obligations. In its latest case on the issue [*Banks v. Dretke*, 540 U.S. 668 (2004)], however, the Supreme Court rebuked the Court of Appeals [for the Fifth Circuit] for relying on such a due diligence requirement to undermine the Brady rule . . . . [T]he clear holding in Banks should have ended that practice.").

The Government also argues that it was not constitutionally required to disclose any *Brady* material in its possession because Mr. Lee was present at his own preliminary hearing. GR at 67. This argument is flawed for a number of reasons. First, Mr. Lee was a juvenile at the time of that hearing. It is widely recognized that young defendants are limited in their capacity to fully grasp the proceedings against them. See, e.g., *Graham v. Florida,* 560 U.S. 48, 78 (2010). It is unreasonable to presume that Mr. Lee would have appreciated the nature of a probable cause analysis at the time of the hearing or its role in his plea, much less identify its legal significance years later and communicate those facts to his federal trial counsel.  Second, the plea was negotiated by a lawyer, not Mr. Lee. The Government offers no factual basis to conclude that his counsel communicated the rationale behind those negotiations, or that the juvenile Mr. Lee would have understood them. Even adult defendants frequently have limited understanding about convictions by plea beyond the bottom-line of whether they will be incarcerated and for how long. See, e.g., *Rehaif v. United State*s, 139 S. Ct. 2191, 2198 (2019) (unreasonable to presume that average defendant convicted of a prior crime "punishable by

imprisonment for a term exceeding one year," but sentenced only to probation, would realize his status as a felon) (emphasis in *Rehaif*). Indeed, the very reason defendants are entitled to the assistance of counsel during plea negotiations is that they are not presumed to understand what considerations are relevant to their criminal liability and sentencing exposure. See *Lafler v. Cooper*, 566 U.S. 156, 163 (2012); *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948). Finally, even if a defendant and a juvenile must be presumed to understand the legal catalyst for a plea offer, the availability of information through the defendant does not negate the Government's duty to disclose exculpatory information or correct false or misleading evidence. See *United States v. McElroy*, 697 F.2d 459, 465 (2d Cir. 1982); *United States v. Howell,* 231 F.3d 615, 625-26 (9th Cir. 2000).

> B. The prosecution violated *Napue v. Illinois* when it told the jurors that they should sentence Danny Lee to death because he was legally responsible for another murder.

Prosecutors violate due process by presenting material testimony that is false or that creates a false impression, or by allowing such testimony to stand uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v.*

*Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Where the prosecution knew or should have known that the evidence presented was false, the defendant's due process rights are violated. *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011).

As the District Court pointed out, *Brady* and *Napue* claims are related but distinct. *Lee*, 2019 WL 6608725, at \*6. To prevail under *Napue*, Mr. Lee need not establish that the Government suppressed evidence nor even that it knew the testimony it was presenting was false. The issue is whether the prosecution should have known that its case was false and whether the false impression created likely influenced the jury. See *Giglio v. United States,* 405 U.S. at 154. Indeed, truth and accuracy, especially in a capital case, is of the utmost importance even when a specific prosecutor acts in good faith. *Id.* at 153.

The Government's motion to vacate the stay never addresses the separate requirements *Napue* imposes. The District Court, however, found a significant possibility that those requirements were met here:

Mr. Lee has also established a significant possibility that two of the Napue elements are met. First, there is a significant possibility that Mr. Lee may be able to show that the United States misled the jury when it stated during the penalty phase that Mr. Lee was "legally" responsible for Mr. Wavra's murder and that his robbery plea was a "gift" from the Oklahoma prosecutor. Dkt. 14-6 at 10 ("I would suggest to you both legally and morally the blood of Joey Wavra's hands is on Danny Lee."); Dkt. 14-2 at 45 ("[Mr. Lee] got a gift in [the Wavra] case from the prosecutors in Oklahoma. They gave him a plea bargain. And this allowed him to get off with just a robbery."). The fee application alone—which suggests that an Oklahoma judge determined that probable cause did not exist to charge Mr. Lee with murder—casts significant doubt on whether these statements were true. Second, for the same reasons the *Brady* materiality element is met, there is a significant possibility that Mr. Lee may be able to show that this narrative affected the judgment of the jury.

*Lee*, 2019 WL 6608725, at *7.

> C. Because § 2255 has proved inadequate to address false and misleading evidence on which his sentence of death relies, § 2241 remains available.

The Government offers two general arguments as to why he cannot prove inadequacy or ineffectiveness here. One is that all cases in this Court finding § 2241 jurisdiction pursuant to the savings clause were wrongly decided. Dkt. 3 at n. 7. Mr. Lee will not take time here to disprove that assertion.

14

The Government then maintains that § 2241 is not available here by pointing to three cases—Davenport, Garza, and Webster—and suggesting they represent the universe of claims permitted by the § 2255 savings clause." Dkt 3 at 15-17. According to the Government, because Mr. Lee's does not present the exact facts as those cases, his claims must fail. Id. Section 2241, however, does not lend itself to such a mechanistic approach. The savings clause provides a remedy when § 2255 has proved inadequate or ineffective, an analysis that requires scrutiny of the specific facts and circumstances of a particular case.

The Government's creation of "categories" to apply in assessing § 2241 petitions is not the proper approach and not how this Court has proceeded. In 1998, In re Davenport, 147 F.3d 605 (7th Cir. 1998) set out a three-part test to determine when § 2241 is available to inmates affected by changes to the Armed Career Criminal Act. Following the Government's logic, Davenport established a "category" of habeas claims allowed by § 2241. But three years later when Garza v. Lappin, 253 F.3d 918 (7th Cir. 2001) was decided this Court did not reject it out of hand because it did not fit in the "narrow category" of Davenport. Instead, the Court examined the particular circumstances of the case to

15

determine whether the essential function of § 2255 was impaired. After determining that it was, the Court crafted a remedy under § 2241 to address the inequity in Garza's case.

Similarly, in the more recent case of Webster v. Daniels, 784 F.3d 1123 (2015), this Court did not merely dismiss Webster's argument by rote application of the case "categories" in Davenport and Garza. Instead, it again examined the circumstances of the case before it to determine whether § 2255 was inadequate or ineffective. In fact, the Government in Webster tried to convince this Court of the same argument it is making before this Court but failed to persuade the circuit. See Webster v. Caraway, No 14.1049 (7th Cir. Apr. 30, 2014), Doc. 16 at 44 (Section entitled "Webster's claim is unlike the narrow band of cases that satisfies the savings clause.")

This Court's savings clause jurisprudence simply does not bear out the limitations the Government has tried to impose on it. See, e.g., *Brown v. Caraway*, 719 F.3d 583 (7th Cir. 2013) (rejecting district court's reliance on Davenport to require showing of innocence to invoke § 2241 and finding jurisdiction on sentencing issue); *Beason v. Marske,* 926 F.3d 932 (7th Cir. 2019) (describing the various ways in which §

16

2241 jurisdiction has been found); *Fulks v. Krueger*, No. 2:15-cv-00033, 2019 WL 4600210, at \*14 (S.D. Ind. Sept. 20, 2019) ("The Seventh Circuit has never held that the Savings Clause is only met in the specific circumstances in which it has so found").

Access to the § 2241 remedy depends not on a petitioner raising the identical facts as a prior, differently situated litigant but on whether he has had "a reasonable opportunity to obtain a reliable judicial determination" of the legality of his conviction or sentence. *In re Davenport,* 147 F.3d at 609. The standard has been articulated in several ways in this circuit but the focal point has remained the same: some structural problem, some "glitch" or "lacuna" in the implementation of the § 2255 statute, must have prevented the petitioner from securing review of the error. See *Webster,* 784 F. 3d at 1136 (noting variety of iterations in the case law but finding that "[a]ll of these decisions hold, nevertheless, that there must be some kind of structural problem with section 2255 before section 2241 becomes available."); *Beason,* 926 F.3d at 939 (§ 2241 authorizes relief from "fundamental sentencing defects") (citations omitted). This is present in Mr. Lee's case.

17

Appellant also argues that § 2255 is not ineffective but rather reflects Congress' desire to bar claims like Mr. Lee's. According to the prosecution because § 2255(h) refers to proving "innocence" by clear and convincing evidence, Congress necessarily must have intended to forever exclude successive claims based on newly discovered evidence related to punishment. Dkt. 3 at 18. This, asserts Respondent, even includes *Brady* and *Napue* claims—like Mr. Lee's—where the Government's suppression of evidence is the direct cause of the inadequacy of § 2255. Id.

Congress' intent, however, is not established so clearly. In fact, there is a circuit split regarding whether newly discovered evidence which affects punishment can support authorization of a successive application. Compare *Babbit v. Woodford,* 177 F.3d 744 (9th Cir. 1999) (allowing authorization) with *In re Bowles,* 935 F.3d 1210 (11th Cir. 2019). It is not an absolute rule, then, that newly discovered evidence—like that in Mr. Lee's case—which speaks directly to the basis of a death sentence cannot support a § 2255 successor.  This is especially true where, as here, the evidence was not only a focal point of the Government's argument to the jury, but was directly referenced by the

jury verdict form in support of the aggravating factor of future dangerousness in support of his death sentence, an aggravating factor disputed heavily by the jury. See Exh. E ("The prior murder was the biggest part of [the future dangerousness finding]").

Most importantly to the issue before this Court, the district court found a significant likelihood that Mr. Lee could meet the requirements of § 2241 because he is challenging the "fundamental legality" of a sentence; he has presented newly discovered evidence showing his death sentence is unconstitutional; and his § 2255 "did not present him with a 'reasonable opportunity…to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence [ ] of 'an unobstructed procedural shot at getting his sentence vacated.'" *Lee,* at *5. This is particularly true where the very reason that the structure of § 2255 prevented review because the United States suppressed evidence and misled the jury. *Id.* As the district court noted, Mr. Lee had made a showing that his claims are not "barred as a matter of law" by the Savings clause and his case requires "further factual development to determine whether the Savings Clause was met." Id. at *6.

## II.    The Balance of the Harms Strongly Favors a Grant of the Stay.

The district court's opinion identifies many of the factors that weigh in favor of a grant of the stay. First, Mr. Lee first brought this *Brady/Napue* challenge by motion filed pursuant to 18 U.S.C. § 2255 in the district court in Arkansas in which he had originally been tried, in September, 2018, almost a year before the Government announced it had adopted an execution protocol or issued its execution warrant.  Slip Op. at 2.  This was not an appeal lodged at the final hour.

Second, although the § 2255 motion was not allowed to proceed, the Arkansas court found that the newly discovered evidence "was material, specifically stating that had the evidence been disclosed at trial, 'it is reasonably likely that . . . the outcome at sentencing would have been different.' [*United States v. Lee*, No. 4:97-cr-00243-KGB, Dkt.1313] at 14.  Mr. Lee would suffer grave harm, therefore, if his case were not allowed to proceed here when a sister court has already determined Mr. Lee's constitutional rights have likely been violated.

Third, the district court noted the many delays occasioned by the Government, including its failure to act "with the necessary urgency

20

even in this litigation" with a pending execution date, and the minimal harm the Government would suffer as the result of this stay. Slip Op. at 9-10.

The Government has no basis for its argument in this Court that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence." Dkt. 3, at 22. To the contrary, the judge who presided at trial when Mr. Lee was sentenced to death believed the result was unfair and arbitrary, and the lead trial prosecutor remains convinced that the disparate sentencing outcomes in this case – Mr. Lee's death sentence, compared with his more culpable co-defendant's life-without-parole sentence – were the result of arbitrary factors, given the evidence against the two men. Even more compellingly, the family of the victims has taken every available opportunity to urge the Government and both this and the previous Administration not to execute Mr. Lee. The matriarch of the family, Earlene Peterson, conveyed her wishes that the execution not move forward, in a video statement submitted to the Administration. These stakeholders held these views even before the current evidence had come to light, that the Government engaged in this misconduct.

21

*See* Exhibits A-D. Thus, the family has no interest in the timely enforcement of this death sentence and the Government, as represented by those who actually prosecuted Mr. Lee and announced his death sentence, have none, either.

The cases cited by the Government do nothing to advance their cause. None of the cases cited involved a *Brady* or *Napue* claim, or any other form of constitutional violation occasioned by government misfeasance.

All of the cases cited by the Government involve review of state death sentences, and refer to the significant interest the states have as sovereign powers to punish offenders and "their good faith attempts to honor constitutional rights." *Calderon v. Thomas*, 523 U.S. 538, 555-56 (1998). As such, the federal courts were cautioned in the proper exercise of comity. Here, no state court judgment is implicated so the call to recognize the independent authority of a state to enact and enforce its own laws is simply not on the table.

Notably, the case on which the Government relies most heavily, *Calderon v. Thompson,* 547 U.S. 538, 556 (1998), did not involve a stay

of execution at all, but rather a sua sponte decision by the Ninth Circuit

Court of Appeals to recall its mandate, not because of any clerical error

or fraud on the court, or any other factor calling into question the

legitimacy of its own judgment, but "to revisit the merits of its earlier

decision denying habeas relief," from a judgment made by a state court.

Id. at 557.

## CONCLUSION

For the foregoing reasons, and because the district court's decision

does not represent an abuse of discretion, Mr. Lee asks this Court to

deny the Government's Emergency Motion to Vacate the District

Court's Order Staying Lee's Execution.

Respectfully submitted, this 6th day of December, 2019.

/s/ *Morris H. Moon*
MORRIS H. MOON
Assistant Federal Public

Federal Capital Habeas Project
Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ *George G. Kouros*
GEORGE G. KOUROS
Assistant Federal Public Defender
Defender
Federal Capital Habeas
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

23

Counsel for Daniel Lewis Lee

Case: 19-3399     Document: 6          Filed: 12/06/2019     Pages: 45

24

DANIEL LEWIS LEE V. UNITED STATES
INDEX OF EXHIBITS[1]

Exhibit A:    LETTER FROM JUDGE EISELE TO A.G. HOLDER ET AL.

Exhibit B:    LETTER FROM FORMER AUSA DAN STRIPLING TO A.G. HOLDER

Exhibit C:    LETTER FROM KIMMA GUREL TO PRESIDENT DONALD J. TRUMP

Exhibit D:    LETTER FROM MONICA VEILLETTE TO PRESIDENT DONALD J. TRUMP

Exhibit E:    DECLARATION OF JUROR 336

---

[1] In compliance with the privacy policies of the Judicial Conference of the United States personal data identifiers have been redacted.

# EXHIBIT A

## G. THOMAS EISELE



### Little Rock, AR 72202

November 7, 2014

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Christopher R. Thyer
United States Attorney
Eastern District of Arkansas
P.O. Box 1229
Little Rock, Arkansas 72203

Re:    *United States v. Daniel Lewis Lee,*
       Eastern District of Arkansas, Court Case No. 4:97-cr-000243

Attorney General Holder and U.S. Attorney Thyer:

I am the federal judge who presided over the criminal trial of Daniel Lee ("Lee") back in 1999, the result of which was a penalty of death being imposed upon Lee, but not on the ringleader Chevie Kehoe ("Kehoe"). I am 91 years old, and I have not had an active docket for several years.

I was informed by counsel for Daniel Lee ("Lee") in a letter dated October 6, 2014, that settlement discussions were ongoing between the Government and Lee's current counsel regarding whether a life sentence "best serves the interests of justice." I declined Lee's counsel's request for an in-person meeting, but took under advisement whether to write a letter. Since that time, I have given considerable thought to the matter.

I obtained copies of and reviewed the prior opinions in the case for the purpose of squaring my memories of the case with the legal record.[1] I feel compelled to write this letter, which I would not normally do, because I believe that requiring Lee to pay the ultimate penalty – death – is unjust under the peculiar circumstances of this case. Of course, this is nothing more than my view, entitled to no weight other than that which you in your official positions deem appropriate.

All who review the record will recognize the unequal and disparate roles that Kehoe and Lee played in their horrific crime spree, which Kehoe directed and Lee joined intermittently. Kehoe

---

[1] The facts and opinions expressed herein are consistent with the record in this case and the views expressed in my post-trial rulings and opinions.

recruited Lee. Kehoe was the charismatic leader; Lee the obedient follower. Lee "participated in the murder of the adults, but would have no part in the killing of [8-year-old] Sarah Powell so Kehoe had done it alone."[2] There was no question that Kehoe was the more culpable of the two with regard to the criminal acts charged in the indictment and proved at trial.

This clear disparity in culpability was recognized when "the Government announced *in camera* [while the jury was considering the penalty phase in Kehoe's case] that if the jury sentenced Defendant Kehoe to life imprisonment, it would not pursue the death penalty for Defendant Lee."[3] As I wrote in a letter to the parties shortly after the death verdict was returned:

> Before the jury determined that Mr. Lee should die, all of the attorneys in the case appeared to be of a mind that the death penalty would be inappropriate in the case of Mr. Lee because the jury had failed to sentence Mr. Kehoe to death. Everyone seemed to be in agreement that the death penalties for both defendants would have been a possible and appropriate outcome, and life without parole for both defendants would have been a possible and appropriate outcome, but no one believed that it would be appropriate to seek the death penalty for Lee if the death penalty had not been imposed upon Mr. Kehoe.[4]

Initially, I set aside the death penalty based on two issues, both of which are addressed briefly below. The Eighth Circuit set aside my opinion and reinstated the death penalty.

**Death Penalty Protocol:**

I set aside the death penalty after concluding that the United States failed to follow its own "Death Penalty Protocol."[5] While this issue ultimately became about whether Lee had "standing" to require the Attorney General to follow her Death Penalty Protocol, this technical framing of the issue does not capture adequately the events leading up to the holding or its impact.

When the jury handed down its life sentence for Kehoe, whose sentencing phase was first, I believed that Lee's sentence was resolved as well, as had been represented. It was surprising to learn that this was not the case and that formal permission to withdraw the death penalty as to Lee had to be received from Washington, D.C. It was even more surprising to learn that permission was being denied, in direct conflict with the recommendation of the local United States Attorney and her assistants in Little Rock, all of them very capable prosecutors.

The chain of events moved swiftly after the Court was advised that the effort to seek death for Lee would in fact go forward. At that point, the trial had been underway for over two months.

---

[2] 374 F.3d 637 (8th Cir. 2004).
[3] 89 F. Supp. 2d 1017, 1032 (E.D. Ark. 2000), rev'd, 274 F.3d 485 (8th Cir. 2001).
[4] No. 4:97CR00243, 2008 U.S. Dist. LEXIS 109771, at * 182 (E.D. Ark. Aug. 28, 2008) (quoting letter).
[5] 89 F.Supp. 2d at 1041.

**Nov. 7, 2014 - Letter to Holder and Thyer**
**Page 3 of 3**

All were weary. After the announcement of the life sentence for Kehoe, but before the jury had decided Lee's fate, I allowed the jurors to return to their homes. I have often wondered whether I made a mistake in not sequestering the jurors for the entire penalty phase.

**Future Dangerousness (Hare "Psychopathy" Tool):**

I set aside the death penalty after concluding that I erred in allowing the introduction of evidence regarding Lee's future dangerousness during the penalty phase of the trial.[6] In making this finding, I held that introduction of the psychopathy evidence improperly emphasized Lee's "future dangerousness" during sentencing even though Lee "chose neither to perform a risk assessment analysis nor to present rebuttal evidence on the future dangerousness aggravating factor" and "was therefore ill-equipped to handle the Government's discussion of psychopathy."[7] Fifteen years later, there is more reason than ever to question the use of the Hare Psychopathy instrument or prejudicial labeling relied upon at sentencing.[8]

I frequently have second-guessed my own decisions in this case and wondered what, if anything, I could have done differently that might have resulted in a more rational outcome. I have no doubt that all involved did the best they could at the time with the knowledge that they had. Still, the end result leaves me with the firm conviction that justice was not served in this particular case, solely with regard to the sentence of death imposed on Daniel Lewis Lee.

Suffice it to say that, now, more than ever, I agree with my following statement, made in concluding that I was unable to grant Lee post-conviction relief under existing law:

> That Petitioner's death sentence is not redressable under existing legal principles does not mean that it constitutes a fair and rational result under the peculiar and special circumstances of this particular case. Perhaps more than anything else, this case illustrates that the most carefully crafted capital punishment regime in the hands of the humans who must carry it out can never be completely free of arbitrariness in all of its implementations.[9]

I wish you both the best. I remain,

Yours truly,

*G. Thomas Eisele*
G. Thomas Eisele

cc:    Karl Schwartz [Attorney for Daniel Lee]

---

[6] *Id.* at 1032.
[7] 89 F. Supp. 2d at 1030.
[8] *See, e.g.*, Kathleen Wayland & Sean D. O'Brien, Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels, 42 Hofstra L. Rev. 519, 521 (2013).
[9] 2008 U.S. Dist. LEXIS 109771 at *185.

# EXHIBIT B

Dan Stripling

███████████

Little Rock, Arkansas 72217
October 28, 2014

Eric H. Holder, Jr.
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Christopher R. Thyer
United States Attorney
Eastern District of Arkansas
PO Box 1229
Little Rock, Arkansas 72203

General Holder and US Attorney Thyer:

Re: Pending execution of Danny Lee

At the request of Danny Lee's representatives, I am writing you regarding my feelings about the pending execution of Danny Lee. I am pleased to honor their request.

As an Assistant United States Attorney, I was lead prosecutor in the investigation and trial of Chevie Kehoe, Danny Lee, and others who plotted to create an Aryan Nation free of other races or ethnic groups. In the course of numerous, varied criminal activities, the Muller family was killed. The investigation lasted two years, and the trial lasted many weeks. Kehoe was unquestionably the leader of the organization and plotter of the Muller murders. Lee's role was that of the "Aryan Hit Man." Evidence presented at trial established that Lee killed the two adults but was unable to execute the little girl. This Kehoe did after insulting Lee for his weakness.

The United States Attorney sought DOJ approval to seek the death penalty against both Kehoe and Lee. Certification was granted. At the time, and today, I thought this the correct decision. After conviction, the jury found that Kehoe should receive a life sentence rather than the death penalty. Following this jury decision, the United States Attorney sought DOJ decertification of Lee's death penalty request. This was denied. At the time, and today, I think decertification would have been the correct decision.

Kehoe was clearly the leader of the group. The robbery and murder of the Muller family were entirely his plan. Lee was the henchman Kehoe used to assist him in this ghastly undertaking.

The decision to seek DOJ approval to withdraw the capital designation in Lee's case was not lightly made. First Assistant Michael Johnson discussed the issue with the victim's family and those law enforcement officers and agents most involved in the investigation and prosecution. Prior to the return of the Kehoe penalty verdict, Johnson and United States Attorney Paula Casey had discussed the action to be taken should the jury not return a death verdict against Kehoe with line prosecutors. There was agreement that should Kehoe not receive a death sentence, none should be sought against Lee.

Prior to becoming an Assistant United States Attorney, I was a state prosecutor and, for fifteen years, in private practice defending most types of criminal cases. I was lead defense attorney in numerous cases in which a capital charge was a consideration and one that resulted in a capital charge, conviction, and defendant's execution. Over decades, my feelings about capital punishment have matured. I do not feel that capital punishment is inherently wrong or that death rows are teeming with innocent people. However, I find very disturbing the randomness with which defendants are charged, convicted, and sentenced in capital cases. This case perfectly illustrates this unexplainable randomness. It is this unpreventable disparity in outcomes that convinced me that the Lee capital designation should have been decertified. There is simply no knowing why, under the facts before the jury, Lee was given a death sentence and Kehoe not. Kehoe is intelligent, appeared clean cut, and had support of convincing witnesses who genuinely supported him. Lee had none of those benefits. If this was the reason for the jury's decision, life should not be taken because of these disparities.

May God bless you in your decision.

Sincerely,

Dan Stripling

cc: Karl Schwartz, Esq.

# EXHIBIT C

President Donald J. Trump
The White House
Washington DC

September 6, 2019

Dear President Trump,

I am writing this letter on behalf of Daniel Lewis Lee in the Federal Death Row Unit in Terre Haute, Indiana who is scheduled for execution on December 9, 2019 for the murder of my sister Nancy Mueller, my brother-in-law William Mueller, and my 8-year-old niece Sarah Powell. I was at the trial every day as the case was presented. I believe that my family was murdered by Daniel Lee and his accomplice Chevie Kehoe.

However, as a sociologist, I have struggled to understand why the two men got drastically different sentences. It was clear from the trial that Chevie Kehoe was the mastermind behind the plan to rob and murder my family. Even though he was the leader, Chevie Kehoe was sentenced to life in prison. However, Daniel Lee got the death sentence. Maybe the jurors based their decision on Daniel Lee's looks; having a swastika neck tattoo and a blind eye made him look pretty scary. Chevie Kehoe was a clean-cut young man with a wife and four kids who would lose their father. **Whatever the reason, it was not fair or just for Daniel Lee to be sentenced to death, and none of the reasons I come up with make me feel any better.**

I understand that we are all products of our environment, society, and unique life events. Daniel Lee and Chevie Kehoe were unlucky enough to be raised in homes that damaged them. They deserve to pay for the crimes they committed, and I think they should both spend the rest of their lives rotting in prison. But that does not justify the death penalty.

It has been over 20 years since William, Nancy and Sarah were murdered. We have worked during that time to get Daniel Lee's sentence reduced. We are hoping you; President Trump will get this done for our family. Instead of continuing the string of violence, please let justice be served by reducing Daniel Lee's sentence to life without parole instead of the death penalty.

Sincerely,
Kimma Gurel

*Kimma E. Gurel*

# EXHIBIT D

Monica Veillette

September 7, 2019

████████████████████████

Deer Park, WA. ███████


President Donald Trump

The White House

1600 Pennsylvania Avenue, NW

Washington, DC 20500


Dear Mr. President,


My name is Monica Veillette, previously Monica Gurel, and I am writing you today regarding Daniel Lewis Lee who is on the Federal Death Row Unit in Terre Haute, Indiana for murdering my aunt and eight-year-old cousin. Thank you for reading my letter and considering my thoughts as I know the victim's families are important to you when making these types of difficult choices.


I am Nancy Mueller's niece and Sarah Powell's first cousin. I have missed every day that we could have had with them since they were murdered; nothing has or could take away the pain I feel since their lives were brutally taken from them. We of course heal in certain ways but never gain complete closure in these types of tragic happenings. I remember my aunt in her strength and beauty, she was a resilient woman and someone who lived out her beliefs with conviction and persistence much like you. I think of my young cousin who was so innocent and kind, joyful and creative. It is with my memories of them in mind and weighing heavy on my heart that I am writing to request that Daniel Lee's sentence be changed to life without the possibility of parole; it is my understanding that you are the only one who could help us now.

Writing this letter does not come easy! I have also felt very naïve for thinking my family's feelings about this could make any kind of difference in a case that had progressed so far in the legal process. I felt hesitant about writing another letter, hesitant in trusting that, this time, our letters would reach someone who could actually do anything about the case. Since Daniel Lee first received this sentence over 20 years ago, we've disagreed with it and have spoken out and written letters asking for help, but no one's been able to help us so far.

Losing family members from such a hateful act can propel a person to deeply consider the meaning of life and our purpose and responsibilities as human beings, our faith and what we want the final statement in the legal file of Nancy and Sarah's lives to be. Do we want it to be another death?

We rarely think about the other person found guilty of the murders because Chevie Kehoe was given a life sentence with no chance of being paroled. We do not worry or stress about his sentence and feel it was fair in response to the crimes he committed. Chevie and Daniel certainly bear responsibility for their choices and the general public has the right to feel and be safe, so I agree with lifetime detainment, of people who have committed violent crimes.

At the trial I heard a lot of testimony about Chevie Kehoe and how he was raised and abused, that he was trained to do exactly what he did by his father, Kirby Kehoe, and that he and his father had planned the robbery and murders of my family members. Chevie looked just 'normal' enough for people to feel compassion and empathy for him to be spared from the death penalty even though, according to the testimony at trial, Chevie was actually the one in charge and the one who murdered my eight year old cousin, Sarah. Daniel Lee looked scary and very little was said about his abusive childhood. It seems uncomplicated to me just by looking at Chevie and Daniel which person appears to be more dangerous and violent and because of that also more blameworthy for these crimes and Daniel did receive a harsher punishment. I don't understand or agree with that. Our justice system cannot be considered fair or just if sentences are doled out based on the appearance of any human being! His physical appearance alongside a seeming lack of testimony about his own dysfunctional childhood left him in a disadvantaged position and, in my opinion, those two things are what unfairly and ultimately secured his getting the death sentence against our wishes.

I was raised by a very nurturing and loving mother but she is also a survivor and that is evident just in the strength it takes to face the loss of her sister and niece but still be willing to accurately look at this situation and call out prejudice where she sees it in this case. My Grandmother has buried her daughter and granddaughter yet she has not become bitter with life, she is still a vibrant and glorious woman who takes the time to send out about thirty greeting cards a month to let others know that they are loved or that she is praying for them. This has been difficult for my Grandma to struggle with her loss while knowing her deep and life-long faith doesn't seek vengeance but calls for justice and mercy.

It was very upsetting to read Senator Tom Cotton's tweet the day the execution date was announced. I don't appreciate anyone politicizing this. I've seen people speaking about what we want, calling for this execution in our name, when they have never spoken to us. I find that very disturbing.

I would also like to take this opportunity to express the compassion and heartache I continue to feel for Daniel's mom, Lea. I am certain this has taken a massive toll on her life and heart. As many times as we have awaited the dreaded phone calls she also is in a waiting pattern. Only she has been waiting for the moment when her child would be given a date for his death. I can't imagine the pain she must feel and ask as much for her peace as our own that Daniel's sentence be changed to life without the possibility of parole. Daniel also has a daughter and if she is growing up with any knowledge about her biological father I would want her to have the opportunity to know her Father if she ever wanted to. I would want him to have the time and opportunity to express remorse for his actions for himself, his family and ours.

Sincerely,

Monica Veillette

# EXHIBIT E

# DECLARATION OF JUROR #336

1. I was one of the jurors for the Chevie Kehoe and Daniel Lee case in 1999. My juror number was 336.

2. The trial lasted a long time, about three months. We met four days a week, every day but Fridays. We were allowed to go home after court but one person people lived a long way from the courthouse so they would sometimes stay at a local hotel.

3. There were three parts to the case. Kehoe and Lee were tried together for the first part of the trial, which was the longest part. We had two penalty phases after that, one for Kehoe and then one for Lee, but they were both much shorter. Most of the main trial was about Chevie Kehoe and his beliefs and crimes. It was pretty clear that he was the ringleader and Lee was just a sidekick. The prosecution called Lee his "lapdog." I had some real questions about the guilt phase but his lawyers didn't really put up much of a defense.

4. The case was that Kehoe was trying to set up some sort of criminal enterprise but it sounded to me like they were just two common thieves more than anything else. It didn't make sense from what we heard that they were an organization trying to take anything over. But we were told that we couldn't

1

convict them of the murders without first finding them to be part of a criminal enterprise.

5. Some of the evidence at the trial stood out. I remember gun parts that the Kehoes had that were stolen from Mr. Mueller. Mueller kept them vacuum sealed in a particular way. Chevie Kehoe's family testified against him and Lee, they seemed knee deep in the crimes too, especially his mother.

6. There also was a hair that belonged to Lee. That was really important to us because it meant that Lee was there at the scene of the Mueller murders. I was recently told by Daniel Lee's lawyers that DNA testing showed that hair was not Lee's. That would have made a big difference to me and I think the other jurors in the guilt phase. One juror found the hair to be the most important piece of evidence against Lee. The hair kept coming up at the penalty phase too.

7. I don't understand why Lee didn't get a new trial when the judge found out later that it wasn't his hair. Without the hair they needed something besides Kehoe's mother.

8. Kehoe was the first one to have his sentencing trial. Everyone knew that Kehoe was in charge of what happened to the Muellers and Lee was the follower, but Kehoe had people come talk for him. I remember a man from Utah who he'd worked for who spoke highly of Kehoe. We also saw Kehoe

2

interacting with his kids in the courtroom. It made him more human,, we saw another side to him. That was a big difference between him and Lee.

9. Lee also did not have people talking for him like Kehoe did. You didn't see another side to him.

10. Lee's look scared people. He had a glass eye that rolled around and those neck tattoos.

11. Lee's sentencing was different because they said he got away with murder in an Oklahoma case. The prosecutor said Lee had been given a gift. It seemed strange to me at the time that the Oklahoma prosecutors would have let him get away with it but that's what they told us. That mattered a lot to the jury. They said we cannot let him get away with a second murder. He did it once and got away with it, he did it again, so he would do it again in prison. The earlier murder made him seem dangerous. The prior murder was the biggest part of that.

12. Lee's lawyers have told me that the story about the murder wasn't true. They said that a judge in Oklahoma dismissed the murder charge, not that the prosecution gave him some sort of gift. That made me very angry to hear. I feel like my vote was based on a lie. The prosecutors are supposed to tell the truth.

13. We were told to give the death penalty we had to find that Lee would be a danger in the future in prison and I didn't believe that he would. But the other jurors kept repeating what the prosecutors had said about how he had already committed a murder and got away with it. That had a lot to do with the sentence because they brought it up over and over and were wearing us down with it. It really had a big influence because there was nothing to say about it other than it just didn't seem right to me. If I had known that the prosecution wasn't telling the truth and he hadn't gotten away with murder, my vote would have been different.

14. I've thought a lot about this case since the trial and it has bothered me all these years. I haven't kept up with other jurors so I don't know whether they have too. But it is a big thing to vote to sentence someone to die. I would not have voted that way if I had known that what we were told about the Oklahoma murder wasn't true. I can't speak for others but I can definitely say that it was important to the jury at the time.

15. I read that Lee is set to be executed in December. I do not want him to be executed. That is why I am writing this now – I hope it will make a difference to someone in charge. This isn't right. It's not fair to ask people to take their job as jurors seriously in a very serious case and then not be honest with them. We were the ones who sentenced him.

4

16. I feel very strongly that Lee should not be put to death.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2019.

Juror 336
------------------------------